IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **SALIM ABBOUD,** | CASE NO. 1:20-CV-01523 |
| **Plaintiff,** | |
| -vs- | JUDGE PAMELA A. BARKER |
| **TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY,** | MEMORANDUM OPINION AND ORDER |
| **Defendant.** | |

Currently pending is Defendant Travelers Property Casualty Insurance Company's Motion for Summary Judgment. (Doc. No. 17.) Plaintiff Salim Abboud filed a Brief in Opposition on July 12, 2021, to which Travelers replied on July 26, 2021. (Doc. Nos. 21, 22.) For the following reasons, Travelers' Motion for Summary Judgment is GRANTED.

**I. Background**

This insurance dispute arises out of an April 23, 2019 incident in which a tree fell on Abboud's garage roof. (Salim Abboud Depo., Doc. No. 17-2, PageID# 181.) The tree damaged 8 hexagonal-shaped roof shingles, bent a portion of the gutter along the garage's roofline, and caused an interior drywall crack in the garage's second-floor loft space. (2/18/2020 Monhemius Report, Doc. No. 17-5, PageID# 274-92.)

Abboud's house was built in the mid-1990s. (Doc. No. 17-2, PageID# 185.) Other than a portion of roof covering an enclosed rear deck, Abboud's roof was also constructed in the mid-1990s. (*Id.*) The roof is mostly covered in hexagonal-shaped, gray-brown asphalt shingles, although at least two roof slopes are covered in different, rectangular-shaped shingles. (*Id.* at PageID# 185, 192.) The

hexagonal, gray-brown shingles are manufactured by CertainTeed and the shingle style name is "Carriage House." (*Id.*; *see also* 8/27/2017 ITEL Report, Doc. No. 17-5, PageID# 311.)

Abboud obtained a high-value homeowners insurance policy, numbered 602945233 637 1, through Travelers. (Travelers Policy, Doc. No. 17-4, PageID# 218.) The Policy insures "against risk of direct physical loss to" Abboud's house. (*Id.* at PageID# 239.) The Policy also sets forth the following provisions regarding Travelers' obligation to settle any losses:

> **3. Loss Settlement.**
> Covered property losses are settled as follows:
> . . .
>
>> **b.** . . . Buildings under Coverage A or B are settled at replacement cost without deduction for depreciation, subject to the following:
>>
>>> **(1)** We will pay the cost to repair, or replace, after application of deductible and without deduction for depreciation, **but not more than the least of the following amounts**:
>>> . . .
>>>
>>> **(b)** The replacement cost **of that part of the building damaged** with material of like kind and quality and for like use; or
>>>
>>> **(c)** The **necessary amount actually spent to repair** or replace the damaged building.

(*Id.* at PageID# 242-43, emphasis added.)

Although the tree fell on Abboud's roof on April 23, 2019, Abboud did not file a claim for tree-related damage with Travelers for several months. (Doc. No. 17-2, PageID# 190.) Abboud "was not certain of the damage immediately after the fall" and did not contact a roofing company to ascertain the damage until August 2019. (*Id.*) In August 2019, Abboud contacted David Averette at Fixler Roofing. (*Id.*) Averette informed Abboud that he might be unable to find a match for the damaged shingles and suggested that Abboud go through Travelers' claims process to determine if

2

Travelers would cover the cost of replacing the entire roof, rather than merely replacing the individual damaged shingles. (*Id.* at PageID# 191.)

On August 22, 2019, Abboud filed a claim for the tree damage with Travelers. (Doc. No. 17-7, PageID# 331.) On August 27, 2019, a Travelers adjuster examined the exterior damage to Abboud's roof. (Doc. No. 17-2, PageID# 191, 207.) He observed that 8 shingles were damaged but that it did not appear that the tree either punctured the exterior façade or ripped open any holes in the exterior. (*Id.* at PageID# 187.) The adjuster also took a sample of Abboud's hexagonal-shaped shingles to determine whether Abboud could obtain either similar or identical replacement shingles. (*Id.* at PageID# 207.) The adjuster ran an "ITEL report" to determine whether similar shingles were available and learned that CertainTeed continued to make identical "Carriage House" shingles that matched the style, shape, and color of Abboud's damaged shingles. (Doc. No. 17-5, PageID# 310.) That evening, the adjuster notified Abboud via email that he was able to locate an exact match for Abboud's damaged shingles. (*Id.* at PageID# 309-11.) Travelers' adjuster also discouraged Abboud from pursuing the claims process because Travelers believed the amount of damage to the 8 shingles was worth less than Abboud's $2,500 deductible. (Doc. No. 17-2, PageID# 200.)

After Travelers informed Abboud that matching CertainTeed Carriage House shingles were available, Averette purchased a bundle of the matching shingles to compare them to Abboud's existing shingles. (*Id.* at PageID# 192.) Averette placed the new Carriage House shingles on the front of Abboud's roof, away from the damaged areas, and took photos to compare the look of the new Carriage House shingles to the existing shingles. (*Id.*) Averette emailed these photos to Abboud. (*Id.*) Abboud believed that these sample shingles were not an exact match to the existing shingles on his roof. (*Id.* at PageID# 191.) Although Abboud reviewed the photos of the sample shingles, he

3

never assessed the damaged shingles on the roof, nor personally compared the new shingles side-by-side to his existing shingles. (*Id.* at PageID# 192.)

On October 7, 2019, Abboud sent Travelers an email containing Averette's photos of the sample shingles laying next to the existing shingles. (*Id.* at PageID# 207.) Abboud requested that Travelers reconsider its earlier determination that the CertainTeed Carriage House shingles were a reasonable match to his existing shingles. (*Id.*) Two days later, Travelers responded to Abboud's email, indicating that it believed the sample shingles were a reasonable match. (*Id.*) Abboud did not have further contact with Travelers until January 2020. (*Id.* at PageID# 200-01.)

In early January 2020, Abboud filed a second, unrelated claim with Travelers regarding interior water damage due to frozen pipes. (*Id.*) On January 15, 2020, a Travelers adjuster inspected the interior and exterior of Abboud's house and determined that Travelers should seek additional assistance to determine the full extent of all tree-related damage to Abboud's house. (Doc. No. 17-9, PageID# 340.) On January 23, 2020 and February 3, 2020, Noah Monhemius, a civil forensic engineer with Engineering & Environmental Services Group, inspected Abboud's house to determine the full extent of the tree-related damage. (Monhemius Affid., Doc. No. 17-5, PageID# 266.) Monhemius identified three separate areas of tree-related damage to Abboud's home. First, Monhemius concluded that the tree's impact caused a hairline to 1/32-inch crack in a portion of the interior drywall in the garage's second-floor loft. (2/18/2020 Monhemius Report, Doc. No. 17-5, PageID# 280.) Monhemius recommended that the crack be repaired by spackling and repainting it. (*Id.*) Second, Monhemius concluded that 8 shingles sustained gouges and/or scrapes consistent with impacts from at least two different fallen trees. (*Id.* at PageID# 281.) Monhemius recommended that the damaged shingles be removed and replaced. (*Id.* at PageID# 284.) Third, he concluded that the

gutter along the garage roofline was bent and damaged, consistent with impacts from one or more fallen trees. (*Id.* at PageID# 281.) He recommended that the impacted gutter, approximately 29 linear feet, be removed and replaced. (*Id.* at PageID# 283.) Monhemius did not observe any other damage to the roof or house that could be attributed to tree impacts. (*Id.* at PageID# 287-88.)

On March 11, 2020, Travelers sent Abboud a letter informing him that it determined the tree-related damage to Abboud's house was "isolated to the garage area roof, gutter and drywall directly below." (3/11/2020 Travelers Letter, Doc. No. 17-9, PageID# 340.) Travelers valued the full cost of repair or replacement of these damages to be $2,847.87 and determined that, after subtracting Abboud's $2,500 deductible, Abboud was entitled to a payment of $347.87. (*Id.*)

On March 13, 2020, Abboud sent Travelers a Sworn Statement in Proof of Loss demanding $189,163.04 for a new roof and other repairs. (*See* 3/31/2020 Travelers Letter, Doc. No. 17-7, PageID# 329.) On March 31, 2020 Travelers rejected Abboud's demand, concluding that Abboud's Proof of Loss was defective because it included "a vast number of repairs not covered under [Abboud's] policy and not as result of a covered cause of loss." (*Id.*) Travelers noted that "[t]he tree impact damages are isolated to 8 marred shingles on the south/rear elevation of the garage, the south gutter of the garage and one crack in the second-floor garage loft area." (*Id.* at PageID# 331.)

On March 2, 2021, Monhemius performed a supplemental inspection of Abboud's roof. (3/17/2021 Monhemius Report, Doc. No. 17-5, PageID# 294.) Monhemius compared the appearance of the sample shingles Averette left on top of Abboud's roof in September 2019 to Abboud's existing shingles. (*Id.*) Monhemius removed the sample shingles from where they sat on the front of the roof and placed them alongside the damaged shingles on the rear garage roof. (*Id.*) Monhemius took several pictures of the sample shingles alongside the damaged shingles to demonstrate that the

shingles shared a similar appearance in shape and color. (*Id.* at PageID# 299-301.) Monhemius noted that the existing shingles "were not brittle and could be manipulated by hand without causing creases or tears," meaning that it would be possible to remove and replace the 8 damaged shingles without damaging the other unaffected shingles. (*Id.* at PageID# 301.)

Abboud filed the instant case in the Medina County Court of Common Pleas on May 26, 2020. (*See* Complaint, Doc. No. 1-3.) Abboud asserts three causes of action against Travelers: (1) breach of contract, (2) declaratory judgment, and (3) bad faith. (*Id.*) Travelers removed the action to this Court on July 9, 2020. (Doc. No. 1.) Travelers filed the instant Motion for Summary Judgment on May 28, 2021. (Doc. No. 17.) Abboud filed an Opposition on July 12, 2021, to which Travelers replied on July 26, 2021. (Doc. Nos. 21, 22.) This matter is now ripe for a decision.

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d

619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

**III.     Analysis**

    **A.     Interpretation of Contracts Under Ohio Law**

Ohio law applies to the interpretation of the Policy. (*See* Doc. No. 17, PageID# 166; Doc. No. 21, PageID# 354.) The Court will briefly address the general principles governing the interpretation of insurance contracts under Ohio law, which will inform the Court's subsequent analysis of the parties' arguments. Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). A court

7

"examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

The absence of definitions does not necessarily make terms ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995); *see also Penton Media, Inc. v. Affiliated Fm Ins. Co.*, No. 1:03-cv-2111, 2005 WL 8171363, at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)) ("Simply because a term in a contract is not defined does not mean that the policy is ambiguous."). "'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.'" *Guman*, 652 N.E.2d 684 at 686 (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Inds. of Ohio, Inc.* 474 N.E.2d 271, 272 (Ohio 1984)). Thus, a court must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. . . . As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* Moreover, "a contract term is not ambiguous simply because parties disagree about its meaning." *Tattletale Portable Alarm Sys., Inc. v. MAF Prods., Inc.*, No. 2:14-cv-00574, 2016 WL 5122545, at *6 (S.D. Ohio Sept. 21, 2016) (citing *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992)).

### B. Counts 1 and 2: Breach of Contract and Declaratory Judgment

In Count 1, Abboud alleges that Travelers breached its contractual obligations under the Policy when it failed to fully cover Abboud's roof damages and attempted to utilize non-conforming

8

shingles to repair his roof. (Doc. No. 1-3, ¶¶ 5-7.) Relatedly, in Count 2, Abboud seeks a declaratory judgment that Travelers must "tender payment to adequately compensate" Abboud for the damages described in Count 1. (*Id.* at ¶ 9.)

In its Motion, Travelers argues that Counts 1 and 2 fail as a matter of law because Travelers fully compensated Abboud for all tree-related direct physical losses when it paid him for the 8 replacement CertainTeed Carriage House shingles, as well as for the other physical damage to the gutter and drywall. (Doc. No. 17, PageID# 167-70.) Travelers further asserts that the replacement shingles are not only of like kind and quality to the existing shingles, but are also an exact match. (*Id.* at PageID# 170-71.)

In his Opposition, Abboud concedes that only 8 shingles sustained damage due to the tree's impact. (Doc. No. 21, PageID# 352.) Further, Abboud does not argue that the CertainTeed Carriage House shingles are an unsuitable replacement for his 8 damaged shingles.[1] Instead, Abboud argues that Travelers failed to adequately address the interior drywall crack and asserts that "[t]he extent to the damage [sic] the crack has caused is essentially awaiting resolution to the question whether or not the roof will be replaced." (*Id.* at PageID# 355.) Abboud contends that "two separate

---

[1] In his Complaint, Abboud alleges that the CertainTeed Carriage House shingles were not a suitable replacement for the 8 damaged shingles. (Doc. No. 1-3, ¶ 6.) In its Motion, Travelers argued at great length that the CertainTeed Carriage House shingles are of like kind and quality to the existing shingles and create a reasonably comparable appearance. (Doc. No. 17, PageID# 170-73.) Abboud does not address Travelers' argument that the CertainTeed Carriage House shingles are indeed an acceptable replacement in his Opposition. (*See* Doc. No. 21.) The Court agrees with Travelers' assertion on Reply that Abboud failed to contest Travelers' contention that the replacement shingles are a suitable replacement and, therefore, has abandoned any claim that the CertainTeed Carriage House shingles are not a suitable replacement of like kind and quality. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (the Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *see also Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal-and state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

9

contractors . . . opined that he requires an entire roof repair" and that "[i]t is undisputed that [Monhemius] did not perform a structural analysis or examine whether or not the crack is evidence of a larger issue . . . ." (*Id.* at PageID# 356.) Thus, according to Abboud, Monhemius's report is "incomplete and erroneous . . . in the face of two separate contractors recommending a roof tear off and replacement" and genuine issues of material fact remain. (*Id.*) For the following reasons, the Court concludes that Abboud's Counts 1 and 2 fail as a matter of law.

Abboud's Policy covers "direct physical loss" to his dwelling, but the Policy does not define the phrase "direct physical loss." (*See* Doc. No. 17-4, PageID# 239.) Thus, the Court looks to the plain, ordinary meaning of the phrase "direct physical loss." *See Santo's Italian Café v. Acuity Ins. Co.*, 508 F. Supp. 3d 186, 197 (N.D. Ohio 2020), *aff'd* 15 F.4th 398 (6th Cir. 2021); *Equity Planning Corp. v. Westfield Ins. Co.*, 522 F. Supp. 3d 308, 318 (N.D. Ohio Feb. 26, 2021). "Direct" is defined as "stemming immediately from a source." *Direct, Merriam-Webster*, https://www.merriam-webster.com/dictionary/direct (last visited Feb. 18, 2022). "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the laws of nature." *Physical, Merriam-Webster*, https://www.merriam-webster.com/dictionary/physical (last visited Feb. 18, 2022). "Loss" is defined as "destruction, ruin" and also as "the act of losing possession: deprivation." *Loss, Merriam-Webster*, https://www.merriam-webster.com/dictionary/loss (last visited Feb. 18, 2022). Thus, a "direct physical loss" requires some perceptible destruction of the covered property. *See Equity Planning Corp.*, 522 F. Supp. 3d. at 318-19. This interpretation comports with the Ohio Court of Appeals's interpretation of a similar term, "direct physical injury," in *Mastellone v. Lightning Rod Mutual Insurance Company*. *See Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio

App. 3d 23, 40, 884 N.E.2d 1130 (2008) (interpreting "direct physical injury" to mean a tangible harm that adversely affected the structural integrity of the covered dwelling).

Here, the direct physical loss to Abboud's dwelling was limited to three discrete areas: (1) 8 gouged and/or scraped roof shingles; (2) a bent portion of exterior rear gutter along the garage roofline; and (3) a cracked piece of interior drywall underneath the spot where the tree fell on the roof. (Doc. No. 17-5, PageID# 279-81.) Upon inspection, Monhemius concluded that the direct physical loss to Abboud's house was limited to just the 8 shingles, bent gutter, and cracked drywall. (Doc. No. 17-5, PageID# 279-81.) Further, Abboud admitted that the fallen tree did not damage every shingle on the roof. (Doc. No. 17-2, PageID# 187.) Abboud also admitted that the physical damage was limited to just the 8 gouged shingles, bent gutter, and cracked drywall. (*Id.* at PageID# 208.) Travelers concluded that Abboud's damages "were isolated to the garage area roof, gutter and drywall directly below," and paid Abboud a total of $347.87, the full cost of repair or replacement minus Abboud's $2,500 deductible. (Doc. No. 17-9, PageID# 340.) Thus, Travelers fully complied with its contractual obligations to pay Abboud only for the physical damages sustained due to the April 23, 2019 tree impact. The rest of Abboud's roof did not sustain any direct physical loss due to the tree's impact. The Court agrees with Travelers that it was not obligated to replace the entirety of Abboud's roof, which did not sustain any physical damage. (Doc. No. 17-2, PageID# 187.) Accordingly, because Travelers fully complied with its contractual obligations, Abboud's Counts 1 and 2 fail as a matter of law.

In his Opposition, Abboud argues for the first time that the interior drywall crack may or may not portend a more serious structural problem, but that he has not yet had the drywall crack inspected because he may need a roof replacement first. (Doc. No. 21, PageID# 354-55.) This

argument is meritless. Abboud fails to support this assertion with any evidence whatsoever and instead relies on two roofing replacement price estimates, his own speculation during deposition, and his attorney's conjecture. (*Id.* at PageID# 356.) This is insufficient to defeat a motion for summary judgment. Abboud "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *citing DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (CA2 1949) (L. Hand, J.), cert. denied, 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983). First, Abboud misrepresents two price quotes from roofing contractors as "opinions" indicating that Abboud's roof must be totally replaced. (*See* Fixler Roofing Estimate, Doc. No. 21-2; Storm Damage Consultants Estimate, Doc. No. 21-3.) Neither document contains any opinion whatsoever that Abboud's roof must be replaced, nor any opinion that a hairline crack in drywall indicates a structural problem with the house. Second, Abboud may not rely on his own unfounded speculation from deposition or his attorney's conjecture that the drywall crack may or may not suggest a serious structural problem, as such speculation is not evidence. *See Procter & Gamble Co. v. Team Tech., Inc.*, 46 F. Supp. 3d 764, 772 (S.D. Ohio 2014) (concluding that "[d]efendants' unfounded speculation and attorney argument is not evidence."). Abboud offers no other evidence whatsoever to refute Travelers' evidence that the cracked drywall could be repaired with spackle and paint or to demonstrate that the crack portends a more serious problem with the house's structural integrity.

Further, although Abboud complains that Monhemius's report is "incomplete and erroneous," and that Monhemius never examined the cracked drywall's "effect on the structure," Monhemius's report expressly belies such an assertion. Monhemius wrote that his visual inspection of Abboud's

house "**was structural in its orientation** and was not intended, or designed, to provide a complete analysis of possible damage to the electrical, plumbing, or mechanical systems of the home." (Doc. No. 17-5, PageID# 287, emphasis added.) Abboud offers no contrary expert testimony to suggest that Monhemius, a civil engineer with several years of building inspection experience, completed an inadequate inspection or that cracked drywall necessitated a more invasive inspection instead of a visual inspection. Abboud may not rely on his own unsupported suspicions to avoid summary judgment when he failed to counter Travelers' expert with his own. *See, e.g., Morris v. State*, No. 80839, 2002 WL 31429811, at *8-10 (Ohio 8th Dist. Ct. App. Oct. 31, 2002) (noting that the plaintiffs, who relied "solely on their own perception" had "failed to come forward with the kind of evidence necessary to rebut the defendants," who presented several expert witnesses at the summary judgment stage); *see also, e.g., Oman v. Advance Auto Parts, Inc.*, No. 3:02-CV-7581, 2003 WL 22722952, at *2 (N.D. Ohio Oct. 28, 2003).

Accordingly, the Court concludes that Travelers fully compensated Abboud for the direct physical loss caused by the fallen tree's impact and, therefore, fulfilled its contractual obligations under the Policy. Counts 1 and 2 fail as a matter of law.

### C. Count 3: Bad Faith

In Count Three, Abboud asserts that Travelers acted in bad faith when it "failed to tender full payment for damages" to Abboud's property and when it "failed to resolve [Abboud's] claim in a timely manner." (Doc. No. 1-3, ¶¶ 12, 14.) For the following reasons, the Court concludes that Abboud's bad faith claim fails as a matter of law.

An insurer "fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification

therefor." *Mastellone*, 175 Ohio App. 3d at 35, quoting *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 554–555, 644 N.E.2d 397. As discussed above, Travelers fulfilled its contractual obligations under the Policy when it fully compensated Abboud for the three discrete areas of direct physical loss caused by the fallen tree. Travelers was under no obligation to replace Abboud's entire roof when only 8 shingles, the gutter, and the drywall sustained direct physical loss. Thus, to the extent that Abboud's bad faith claim is premised on his assertion that Travelers failed to replace the entire roof, the claim fails as a matter of law.

Moreover, to the extent that Abboud's bad faith claim is premised on his assertion that Travelers failed to timely process his claim, Count 3 still fails. Abboud argues in his Opposition that Travelers failed to conduct a full inspection of Abboud's home until January 2020, five months after Abboud filed his claim. (Doc. No. 21, PageID# 357-58.) However, the record clearly belies Abboud's assertion that Travelers "dragged its feet" on processing Abboud's claim and Abboud has presented no evidence to the contrary. (*Id.*) Travelers conducted its initial inspection of Abboud's roof on August 27, 2019, only five days after Abboud filed his claim. (Doc. No. 17-2, PageID# 200.) At that time, Travelers' adjuster noted that the tree did not puncture or rip through the roof or any other part of the house's exterior. (*Id.* at PageID# 187.) Further, Abboud did not report any interior damage. (*Id.* at PageID# 187-89.) Thus, as of August 27, 2019, Travelers determined that Abboud's house had only sustained exterior, not interior, damage and advised Abboud that Travelers would only pay to replace the 8 damaged shingles with identical CertainTeed Carriage House shingles. (*Id.* at PageID# 200.) Abboud did not contact Travelers again until October 7, 2019, when he asked Travelers to reconsider its determination that the CertainTeed Carriage House shingles reasonably matched the 8 damaged shingles. (*Id.* at PageID# 207.) Two days later, on October 9, 2019, Travelers

informed Abboud that it maintained that the CertainTeed Carriage House shingles were a reasonable match for Abboud's damaged shingles. (*Id.*)

Abboud had no further contact with Travelers until he filed a separate claim for water damage on January 10, 2020. (*Id.* at PageID# 200-01.) During its January 2020 inspection of Abboud's water damage claim, Travelers learned there was a possibility that the April 23, 2019 tree impact may have caused interior damage. (*Id.*) On January 15, 2020, just five days after receiving Abboud's water damage claim, Travelers retained EES Group to investigate whether the April 23, 2019 tree impact caused any interior damage. (*Id.*) Monhemius conducted two inspections shortly thereafter, on January 23, 2020 and February 3, 2020. (*Id.*; *see also* Doc. No. 17-5, PageID# 266.) These facts disprove Abboud's unsupported assertion that Travelers delayed inspecting his tree damage claim and demonstrate that Travelers conducted a further timely investigation upon learning of the possibility of interior tree-related damage in January 2020. Accordingly, to the extent that Abboud's bad faith claim is premised on his assertion that Travelers purposely delayed processing his insurance claim, Count 3 still fails as a matter of law.

## IV.  Conclusion

Accordingly, for the reasons set forth above, Travelers' Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

    *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  February 23, 2022    U. S. DISTRICT JUDGE

15